IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RODNEY JARVIS, | ) | CASE NO.  5:23-CV-01230-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) | |

Plaintiff, Rodney Jarvis ("Plaintiff" or "Jarvis"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In November 2020 and June 2021, Jarvis filed an application for POD, DIB, and SSI, alleging a disability onset date of October 31, 2015, and claiming he was disabled due to neck surgeries, carpal tunnel surgery, restless leg syndrome, heart condition, high cholesterol, high blood pressure, and a stutter. (Transcript ("Tr.") at 17, 96.)  The applications were denied initially and upon reconsideration, and Jarvis requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 17.)

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

1

On May 12, 2022, an ALJ held a hearing, during which Jarvis, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On July 7, 2022, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 17-31.). The ALJ's decision became final on May 18, 2023, when the Appeals Council declined further review. (*Id.* at 1-7.)

On June 22, 2023, Jarvis filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11-12.) Jarvis asserts the following assignments of error:

(1) The ALJ erred in evaluating Plaintiff's need for an assistive device, whether a cane or a wheelchair.

(2) The ALJ erred in not evaluating whether Plaintiff suffered from a neurocognitive disorder and a deficit in intellectual ability, and in not including appropriate limitations for Plaintiff's intellectual deficits into the residual functional capacity finding.

(Doc. No. 11.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Jarvis was born in June 1970 and was 51 years-old at the time of his administrative hearing (Tr. 17, 29), making him a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). He has a limited education. (Tr. 29.) He has past relevant work as a construction worker and a scrap burner. (*Id.*)

2

**B.      Relevant Medical Evidence[2]**

Jarvis' school records show he received speech therapy for improving his language skills and developing more fluent speech.  (*Id.* at 427.)  Lynne Duohon, a speech and hearing therapist, noted a stutter that impacted speech fluency.  (*Id.*)

Intelligence testing consisting of the Wechsler Intelligence Scale for Children-Revised ("WISC-R") conducted when Jarvis was in 10th grade revealed a full-scale IQ of 82 and a verbal IQ of 74.  (*Id.* at 414.)  Additional testing showed a third-grade reading level and fourth-grade mathematics level.  (*Id.*)  His school determined that Jarvis was not eligible for special education services at that time.  (*Id.*)

On November 15, 2010, as part of a prior application for benefits, Jarvis saw James Lyall, Ph.D., for a consultative psychological examination.  (*Id.* at 430.)  Dr. Lyall noted Jarvis had driven himself to the examination and was accompanied by his wife.  (*Id.*)  Jarvis reported a history of anger management difficulties and dropping out of school.  (*Id.*)  He could not read a newspaper, although he could do some addition.  (*Id.*)  His wife managed their finances, and he could not write a check.  (*Id.* at 432.)  He could count small amounts of change.  (*Id.*)  He could get along with people sometimes.  (*Id.*)  He did not have any hobbies or interests and did not do much around the house.  (*Id.*)  He spent his days sitting and watching TV.  (*Id.*)

On examination, Dr. Lyall found Jarvis casually dressed, with a neat and clean appearance.  (*Id.* at 431.)  Dr. Lyall noted Jarvis was "very quiet and withdrawn," and that he appeared to try his best during the evaluation.  (*Id.*)  Jarvis spoke in a slow manner with a "significant stammer at times," although Dr. Lyall had no problem understanding Jarvis' responses.  (*Id.*)  Jarvis demonstrated a moderate difficulty in understanding complicated questions.  (*Id.*)  While Jarvis could recall three out of three objects

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

immediately, he could only recall one of three objects after five minutes.  (*Id.* at 432.)  He could repeat four numbers forward and three numbers backward.  (*Id.*)  Intelligence testing revealed scores "within the extremely low range on the various IQ indicators."  (*Id.*)  Jarvis had difficulty with complex verbal comprehension skills and had weak auditory attention skills and processing speed.  (*Id.*)  Dr. Lyall diagnosed Jarvis with a cognitive disorder, not otherwise specified, an impulse control disorder, not otherwise specified, and mild stuttering.  (*Id.*)  Dr. Lyall opined Jarvis had a moderate impairment in his ability to relate to others and marked impairments in his abilities to maintain attention and perform simple, repetitive tasks and withstand the stress and pressure of day-to-day work activity.  (*Id.* at 433.)

On November 20, 2015, Jarvis saw Andrew Stalker, M.D., for evaluation of tremors in his hands and legs.  (*Id.* at 473, 477.)  Jarvis reported he had been told his leg tremors were restless leg syndrome.  (*Id.* at 473.)  Jarvis endorsed variable shaking that seemed to be worse at night, hands and legs shaking at the same time, no pain, no stiffness, and no worsening with holding something.  (*Id.*)  Sometimes his hands cramped.  (*Id.*)  Jarvis denied any problems with gait.  (*Id.*)  Mirapex helped his restless leg syndrome, although sometimes he needed to get out of bed and move his legs because they felt restless.  (*Id.*)  Jarvis denied any numbness in his feet.  (*Id.*)  On examination, Dr. Stalker found normal speech and language, normal concentration, normal memory, full strength with normal tone, no tremor or involuntary movements, decreased deep tendon reflexes throughout, sensation absent to vibration, temperature, and pinprick throughout with the exception of the head, normal coordination, and normal gait and station.  (*Id.* at 475-76.)  Dr. Stalker diagnosed spinal stenosis of the cervical region, tremor (although there was no tremor on examination), and restless leg syndrome.  (*Id.* at 476.)  Dr. Stalker ordered a CT of the cervical spine.  (*Id.*)

4

A December 9, 2015 CT of the cervical spine revealed operative changes of the cervical spine from Jarvis' previous surgeries, as well as degenerative changes of the cervical spine and moderate bilateral neural foraminal narrowing at C5-C6.  (*Id.* at 478.)

On August 16, 2016, Jarvis saw Dr. Stalker for his restless leg syndrome, spinal stenosis, skin paresthesia, and lumbago.  (*Id.* at 458.)  Jarvis reported a feeling of pin pricks in his feet to his mid-calves. (*Id.*)  This is the feeling Jarvis described as "restless."  (*Id.*)  Jarvis denied improvement in his symptoms with movement or with a change in the dose of his medication.  (*Id.*)  On examination, Dr. Stalker found normal gait and station.  (*Id.* at 460.)  Dr. Stalker ordered bloodwork, stopped Mirapex, and started Jarvis on gabapentin.  (*Id.* at 460-61.)

On January 23, 2018, Jarvis saw Dr. Stalker for his restless leg syndrome.  (*Id.* at 454.)  Jarvis complained of continued restless leg syndrome symptoms.  (*Id.*)  Dr. Stalker asked if Jarvis was still taking gabapentin, but Jarvis could not remember the name of his medication.  (*Id.*)  Dr. Stalker determined Jarvis was on Mirapex at the time.  (*Id.*)  Jarvis reported falling three to four weeks ago when his legs gave out as he was walking down the stairs.  (*Id.*)  He bruised his back.  (*Id.*)  On examination, Dr. Stalker found abnormal strength and absent bilateral lower extremity reflexes, but gait and station were normal.  (*Id.* at 456.)  Dr. Stalker stopped Mirapex and started Jarvis on gabapentin.  (*Id.*)

On February 21, 2018, Jarvis saw Natalie Meyer, Psy.D., for a consultative psychological evaluation.  (*Id.* at 437, 442.)  Jarvis reported sleep difficulties but denied feeling sad or anxious and denied a history of mental health issues and services.  (*Id.* at 439.)  He told Dr. Meyer he had been hospitalized in the past for his mood but could not remember why.  (*Id.*)  His wife and son did the chores and grocery shopping.  (*Id.*)  He did not prepare meals.  (*Id.*)  He can drive.  (*Id.*)  He skipped many appointments and reported he got sidetracked.  (*Id.*)  Jarvis denied having any friends or hobbies.  (*Id.*)  He spent his day watching TV.  (*Id.*)  He could not identify any stress management strategies.  (*Id.*)

5

On examination, Dr. Meyer noted Jarvis walked slowly with a cane. (*Id.*)  His appearance was neat and clean, and his grooming and hygiene were adequate, although his shirt had been misbuttoned. (*Id.*)  Dr. Meyer found Jarvis cooperative and polite, and he seemed to persist to the best of his abilities during the examination.  (*Id.*)  Jarvis exhibited limited understanding of questions and directions and required clarification and prompts.  (*Id.*)  He stammered and mumbled, and Dr. Meyer had a hard time understanding him at times.  (*Id.*)  Jarvis provided short answers to questions.  (*Id.*)  Jarvis demonstrated appropriate eye contact, a wide range of affect, an appropriate mood, and cooperative behavior.  (*Id.* at 440.)  He recalled four digits forward and two digits backward.  (*Id.*)  He could not perform serial sevens. (*Id.*)  He performed eight iterations of serial threes in 79 seconds with six errors.  (*Id.*)  He counted backward from twenty to one in 23 seconds with one error.  (*Id.*)  Dr. Meyer determined Jarvis appeared to be functioning in the impaired to borderline range of intelligence.  (*Id.*)  Dr. Meyer diagnosed Jarvis with an unspecified neurocognitive disorder by history.  (*Id.*)  Dr. Meyer opined Jarvis "may require simplification and repetition in order to understand and carry out instructions," "he may require repetition and prompts in order to complete tasks," and "he may become confused during multistep tasks."  (*Id.* at 441.)  His stammer may affect his ability to engage in conversation, and his intellectual limitations may cause him to be unaware of and/or struggle with social norms and relationships in the workplace.  (*Id.* at 442.)  Dr. Meyer further opined that "[d]ue to limited cognitive abilities, the claimant would require support to adjust to new tasks or changes" and he "may have difficulty problem-solving to adjust to unexpected changes in working conditions."  (*Id.*)

On July 17, 2019, Jarvis saw Dr. Stalker for follow up of his skin paresthesia. (*Id.* at 449.)  Jarvis reported doing "ok" since his last appointment, although he had run out of Mirapex and had not been able to sleep.  (*Id.*)  He had tried gabapentin, but it did not help.  (*Id.*)  He continued to endorse neck and low back pain.  (*Id.*)  He had undergone physical therapy for his pain, and it did not help much.  (*Id.*)  Jarvis

told Dr. Stalker his restless leg syndrome was a little worse.  (*Id.*)  His legs woke him up in the middle of the night.  (*Id.*)  On examination, Dr. Stalker found normal speech and language, normal strength, normal tone, and normal gait and station.  (*Id.* at 451.)  Sensation was decreased in a stocking-glove pattern.  (*Id.*)  Dr. Stalker restarted Mirapex.  (*Id.*)

On March 3, 2020, Jarvis saw Dr. Stalker for follow up of his restless leg syndrome and lumbago. (*Id.* at 445.)  Jarvis reported his restless leg syndrome was controlled by his medication.  (*Id.*)  On examination, Dr. Stalker found normal gait and station.  (*Id.* at 447.)  Dr. Stalker continued Jarvis' medication at the current dose.  (*Id.*)

On October 1, 2020, Jarvis went to the emergency room with complaints of sharp left-sided chest pain that he rated an 8/10 with some shortness of breath.  (*Id.* at 490-91.)  Treatment providers noted Jarvis' bloodwork was unremarkable, an EKG was borderline, and a chest x-ray was clear.  (*Id.* at 491-92.)  However, because of his medical history, treatment providers sought to admit Jarvis for a stress test. (*Id.* at 491.)  Jarvis refused to be admitted and insisted he was feeling better and would follow up with his doctor.  (*Id.* at 491-92.)  Treatment providers noted Jarvis was competent to make that decision, although they strongly advised against it.  (*Id.* at 492.)

On October 8, 2020, Jarvis saw cardiologist Ramana Podugu, M.D., for evaluation of his chest pain.  (*Id.* at 549.)  Dr. Podugu noted that Jarvis "was very active and able to manage activities of daily living without any limitations"; however, his comorbidities and tobacco chewing concerned her.  (*Id.*)  A physical examination revealed normal findings.  (*Id.* at 550-51.)  Dr. Podugu ordered an echocardiogram and a myocardial perfusion test.  (*Id.* at 549.)

On October 12, 2020, Jarvis saw Dr. Vincent Yu Han Lee, M.D., to establish care.  (*Id.* at 562.) Dr. Yu Han Lee noted that Jarvis complained of chest pain but was otherwise normal on examination.  (*Id.* at 564.)  Jarvis was ambulating normally.  (*Id.*)

7

On December 3, 2020, Jarvis underwent a myocardial perfusion test, which was normal.  (*Id.* at 521-24.)

On December 22, 2020, Jarvis saw Dr. Podugu for follow up.  (*Id.* at 535.)  Dr. Podugu recommended Jarvis be active, lose weight, and be compliant with his medical treatment plan.  (*Id.*)  Dr. Podugu suggested a low salt-diet and regular exercise.  (*Id.*)

On January 26, 2021, Jarvis saw Dr. Yu Han Lee for follow up of his hypertensive disorder.  (*Id.* at 554.) On examination, Dr. Yu Han Lee found normal ambulation.  (*Id.* at 556.)

On February 23, 2021, Jarvis saw Dr. Yu Han Lee for follow up of his hypertensive disorder.  (*Id.* at 631.)  On examination, Dr. Yu Han Lee found normal ambulation.  (*Id.* at 633.)

On March 16, 2021, Jarvis saw Angela Rickard, PA-C, for follow up of his restless leg syndrome and skin tingling.  (*Id.* at 574.)  Rickard noted it had been over a year since Jarvis had last been seen.  (*Id.* at 575.)  Jarvis reported doing well since his last visit; his legs did not wake him up in the middle of the night or prevent him from going to sleep, and he had no symptoms during the day.  (*Id.*)  Rickard continued Jarvis' medication and directed him to follow up in a year or sooner if he experienced new neurological complaints.  (*Id.* at 575-76.)

On March 23, 2021, Jarvis saw Dr. Yu Han Lee for follow up of his hypertensive disorder.  (*Id.* at 626.)  On examination, Dr. Yu Han Lee found normal ambulation.  (*Id.* at 628.)

On March 24, 2021 Jarvis saw Bryan Krabbe, Psy.D, for a psychological consultative examination. (*Id.* at 596.)  Jarvis reported difficulty learning previous jobs, staying focused, and performing tasks in a timely manner.  (*Id.* at 598.)  Jarvis also endorsed trouble getting along with coworkers and supervisors, as well as difficulty managing work stress.  (*Id.*)  Jarvis told Dr. Krabbe he felt sad and worthless at times, he worried about a lot of things, he isolated, he did not trust people, he got irritable at times, and he had problems learning.  (*Id.*)  He spent his days watching TV.  (*Id.*)  Jarvis reported he could care for his

8

hygiene, perform household chores, grocery shop, and prepare basic meals, although he was slowed down by his pain and he lacked motivation.  (*Id.*)  Jarvis denied socializing with anyone other than his family. (*Id.*)

On examination, Dr. Krabbe noted Jarvis had adequate energy but moved at a slow rate of speed and used a cane.  (*Id.* at 599.)  Jarvis drove himself to the appointment.  (*Id.*)  Dr. Krabbe found adequate grooming and hygiene, cooperative behavior, euthymic mood, and good effort in completing tasks.  (*Id.*) Jarvis' speech was slowed a bit by his frequent stutter.  (*Id.*)  Jarvis recalled six digits forward and three digits backward.  (*Id.*)  He could recall one out of three words after a short delay.  (*Id.*)  He identified two of the past three presidents.  (*Id.*)  He demonstrated no difficulty following the conversation or responding to questions.  (*Id.*)  Jarvis could not perform serial sevens in 30 seconds.  (*Id.*)  Jarvis performed serial threes in 25 seconds with two errors.  (*Id.*)  He struggled to calculate division and fractions.  (*Id.*) Dr. Krabbe determined Jarvis' general level of intelligence "appeared to fall well below normal limits."  (*Id.*) Dr. Krabbe diagnosed Jarvis with an unspecified neurodevelopmental disorder and unspecified cannabis-related disorder in sustained remission.  (*Id.* at 600.)  Dr. Krabbe opined that Jarvis' reported learning problems and history of special education services "may lead to difficulties acquiring new information in work settings."  (*Id.* at 601.)  Dr. Krabbe further opined Jarvis' difficulty in performing serial sevens and threes suggested difficulty maintaining attention and focus, but he demonstrated adequate task persistence and no indication of distraction during the evaluation.  (*Id.*)  Dr. Krabbe opined Jarvis would be able to understand and respond to supervisor feedback and relate to coworkers.  (*Id.*)  Dr. Krabbe further opined Jarvis' "limited cognitive abilities may result in difficulty solving problems and require excessive support."  (*Id.*)

9

On June 22, 2021, Jarvis saw Dr. Yu Han Lee for follow up of his hypertensive disorder and for complaints of leg pain and swelling.  (*Id.* at 621.)  On examination, Dr. Yu Han Lee found normal ambulation and no edema.  (*Id.* at 623.)

On August 20, 2021, Jarvis saw Dr. Yu Han Lee for completion of disability paperwork and complaints of right-hand pain and swelling.  (*Id.* at 616, 618.)  On examination, Dr. Yu Han Lee found mild swelling and tenderness of the dorsal aspect, palmar prominence, and palmar aspect of the right hand.  (*Id.* at 618.)  X-rays taken that day showed osteoarthritis of the right hand, and Dr. Yu Han Lee advised Jarvis on conservative management.  (*Id.* at 619.)

That same day, Dr. Yu Han Lee completed a Medical Source Statement regarding Jarvis' physical capacity.  (*Id.* at 607-08.)  Dr. Yu Han Lee opined Jarvis could occasionally lift and/or carry 10 pounds and he could stand for half an hour without interruption as a result of his weakness, restless legs, numbness/tingling of his hands, and back and neck pain.  (*Id.* at 607.)  His impairments did not affect his ability to sit.  (*Id.*)  He could rarely climb, balance, stoop, crouch, kneel, and crawl.  (*Id.*)  He could frequently reach, push/pull, and perform fine and gross manipulation.  (*Id.* at 608.)  He must avoid heights and moving machinery.  (*Id.*)  Dr. Yu Han Lee stated that a cane and wheelchair had been prescribed.  (*Id.*)  Jarvis would need to alternate between sitting and standing at will.  (*Id.*)  He experienced severe pain that would interfere with his concentration, take him off task, and cause absenteeism.  (*Id.*)  He needed to elevate his legs to 45 degrees at will.  (*Id.*)  He would need three hours of additional breaks during an eight-hour workday.  (*Id.*)  Dr. Yu Han Lee opined that Jarvis' restless legs, chest pain, hypertension, and back and neck pain would interfere with his ability to work eight hours a day, five days a week.  (*Id.*)

On October 19, 2021, Jarvis saw Dr. Yu Han Lee for his annual physical.  (*Id.* at 686, 689.)  Jarvis reported continued intermittent chest pains and leg pain that worsened as the day went on.  (*Id.* at 686.)  Jarvis told Dr. Yu Han Lee he had been having a lot of trouble with his legs lately and had difficulty

10

standing on them, so Jarvis wanted a wheelchair.  (*Id.*)  A physical examination revealed normal findings. (*Id.* at 688.)  Dr. Yu Han Lee noted Jarvis had been using an assistive device and noted he would prescribe a standard wheelchair.  (*Id.* at 689.)

On October 23, 2021, Jarvis saw Craig Hermann, D.O., for a consultative physical examination. (*Id.* at 695, 698.)  Jarvis reported weakness throughout his arms and legs, although his legs were worse than his arms, and numbness and tingling in his extremities, legs worse than arms.  (*Id.* at 695.)  Jarvis told Dr. Hermann he had been using a cane for ambulation inside and outside his home for the past several years, but "progressive weakness" was causing ambulation to be more difficult.  (*Id.*)  While Jarvis' primary care physician had ordered him a wheelchair, Jarvis had not been able to get it yet.  (*Id.*)  At the examination, Jarvis was using a wheelchair he had borrowed from a family member.  (*Id.*)

On examination, Dr. Hermann found mostly fluent speech with a stutter or mild aphasia throughout.  (*Id.* at 697.)  Dr. Hermann further found no edema of the extremities but focal sensory deficits in a symmetric distribution in the hands up to above the wrist, with complete absence of sensation throughout the hand, and of his lower legs from mid-shin down, with complete absence of any sensation to fine touch.  (*Id.*)  Muscle strength testing revealed some focal weakness in Jarvis' arms and legs, worse in his legs.  (*Id.*)  Dr. Hermann found Jarvis had "significant difficulty even standing up straight" and he was "very unsteady when trying to take a couple steps."  (*Id.*)  Jarvis could not raise himself on heels or toes, he could not perform tandem walk or balance on one foot, and he was afraid to attempt to squat because of weakness and risk of falling.  (*Id.*)  Dr. Hermann found some tenderness to palpation of the posterior neck over the midline incision in the paraspinal musculature bilaterally and mild swelling of the metacarpophalangeal joints on the second through fifth digits of each hand, with some discomfort during range of motion testing at those joints.  (*Id.*)  Dr. Hermann opined as follows:

11

> Overall, his physical examination is very significant for weakness of his upper and lower extremities, worse in his lower extremities leading to significant disability with attempting to stand and walk.  He also has some weakness in the upper extremities and pronounced decreased sensation of his hands which is causing decreased dexterity and inability to perform fine tasks with his hands.

(*Id.*)

On February 16, 2022, Jarvis saw Dr. Yu Han Lee for a physical, follow up, and complaints of right shoulder pain.  (*Id.* at 710, 713.)  Jarvis reported right shoulder pain that started a year ago that had gotten worse.  (*Id.* at 710.)  Jarvis described the pain as aching, sharp, and throbbing and rated it as a 6/10. (*Id.*)  The pain radiated down his arm and was constant.  (*Id.*)  Lifting, movement, and pushing aggravated his pain, while nothing alleviated it.  (*Id.*)  Jarvis reported associated symptoms of decreased mobility, joint tenderness, and difficulty falling asleep.  (*Id.*)  Dr. Yu Han Lee noted Jarvis used a cane in his right hand.  (*Id.*)  Jarvis reported using a wheelchair when he knew he had to walk a lot.  (*Id.*)  On examination, Dr. Yu Han Lee found pain to palpation of the right deltoid muscle body, slightly diminished range of motion compared to the left, 4/5 muscle strength on the right, negative empty can test, negative subscap push off, no obvious swelling or bruising, and poor insight and judgment.  (*Id.* at 712.)  Dr. Yu Han Lee diagnosed Jarvis with a right rotator cuff capsule sprain and thought it likely that Jarvis had right rotator cuff tendonitis.  (*Id.* at 713.)  Dr. Yu Han Lee discussed conservative management with Jarvis, including physical therapy, which Jarvis declined.  (*Id.*)  Dr. Yu Han Lee recommended rest, heat, and analgesics for pain management and directed Jarvis to follow up if there was no improvement.  (*Id.*)

That same day, Dr. Yu Han Lee completed a Medical Source Statement regarding Jarvis' physical capacity.  (*Id.* at 706-07.)  Dr. Yu Han Lee opined Jarvis could occasionally lift and/or carry 10 pounds and he could stand for half an hour without interruption as a result of his weakness, restless legs, numbness/tingling of his hands, and back and neck pain.  (*Id.* at 706.)  His impairments did not affect his ability to sit.  (*Id.*)  He could rarely balance and never climb, stoop, crouch, kneel, and crawl.  (*Id.*)  He

could occasionally reach, push/pull, and perform fine and gross manipulation.  (*Id.* at 707.)  He must avoid heights, moving machinery, temperature extremes, and pulmonary irritants.  (*Id.*)  Dr. Yu Han Lee stated that a cane and wheelchair had been prescribed.  (*Id.*)  Jarvis would need to alternate between sitting and standing at will.  (*Id.*)  He experienced severe pain that would interfere with his concentration, take him off task, and cause absenteeism.  (*Id.*)  He needed to elevate his legs to 45-90 degrees at will.  (*Id.*)  He would need four hours of additional breaks during an eight-hour workday.  (*Id.*)  Dr. Yu Han Lee opined that Jarvis' complex medical history, chronic pain, and decreased mobility because of pain would interfere with his ability to work eight hours a day, five days a week.  (*Id.*)

Dr. Yu Han Lee also completed a Medical Source Statement regarding Jarvis' mental functioning. (*Id.* at 708-09.)  Dr. Yu Han Lee opined Jarvis had extreme limitations in the following areas: describe work activity to someone else; ask and answer questions and provide explanations; cooperate with others; ask for help when needed; handle conflicts with others; work at an appropriate and consistent pace; ignore or avoid distractions while working; change activities or work settings without being disruptive; work close to or with others without interrupting or distracting them; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods during the day; respond to demands; adapt to changes; manage his psychologically based symptoms; set realistic goals; and make plans for himself independent of others.  (*Id.*)  Dr. Yu Han Lee further opined Jarvis had marked limitations in his abilities to sequence multistep activities and initiate and perform a task that he understands and knows how to do.  (*Id.*)  Dr. Yu Han Lee stated that Jarvis had a "general appearance of detachment" and slow cognitive processing, along with "significant delayed speech" due to a stutter.  (*Id.* at 709.)  Dr. Yu Han Lee opined that Jarvis would be unable to perform any work requiring communication ability.  (*Id.*)

13

On February 22, 2022, Jarvis saw PA-C Rickard for follow up of his restless legs and spinal stenosis.  (*Id.* at 718.)  Jarvis reported his restless legs were getting worse as his medication was wearing off.  (*Id.*)  Jarvis told Rickard he was waking up at one a.m. because of his legs, and then he could not go back to sleep afterwards.  (*Id.* at 719.)  His legs were restless all day.  (*Id.*)  Rickard adjusted Jarvis' medication.  (*Id.*)

On April 19, 2022, Jarvis saw Dr. Yu Han Lee for follow up regarding his hypertension and lipids. (*Id.* at 729.)  Jarvis denied edema and extremity weakness.  (*Id.*)

On April 27, 2022, Jarvis saw Dr. Yu Han Lee for a new diagnosis of diabetes.  (*Id.* at 731.)  Dr. Yu Han Lee recommended starting the ADA diet and increasing exercise while holding off on medication at that time.  (*Id.*)

**C.     State Agency Reports**

**1.     Mental Impairments**

On April 2, 2021, David Dietz, Ph.D., reviewed the file and determined Jarvis had moderate limitations in his abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 99.)  Dr. Dietz opined Jarvis was capable of understanding and remembering simple work instructions and persisting in simple, unskilled work tasks.  (*Id.* at 102.)  He could concentrate and persist "on simple work instructions or in environments where change is static."  (*Id.* at 103.)  Dr. Dietz opined Jarvis could interact occasionally in situations that do not require persuasion or frequent contact with the general public.  (*Id.*)  Jarvis could carry out tasks where duties are relatively static, and changes can be explained.  (*Id.*)

On September 20, 2021, on reconsideration, Aracelis Rivera, Psy.D., reviewed the file and adopted Dr. Dietz' findings, except he clarified that Jarvis overall could interact superficially.  (*Id.* at 121, 125-26.)

14

2.    **Physical Impairments**

On February 22, 2021, Diane Manos, M.D., reviewed the file and adopted the residual functional capacity from the prior ALJ decision dated January 22, 2013, finding no material changes in basis or function since that time.  (*Id.* at 102.) The prior RFC limited Jarvis to light work, with the following additional limitations: frequent climbing of ramps and stairs, but never climbing ladders, ropes, or scaffolds; frequent balancing and stooping; and occasional kneeling, crouching, and crawling.  (*Id.*)

On November 1, 2021, on reconsideration, Gary Hinzman, M.D., reviewed the file and adopted Dr. Manos' findings.  (*Id.* at 124.)  Dr. Hinzman wrote:

> Note there is a wide discrepancy between the current IMCE and the TS functional in the in the [sic] TS functional review and the the [sic] objective MER as recent objective exams in the MER through 8/2021. There is no severe MDI that explains the inability to stand and walk or the need for any ambulatory aids including his present presentation in a wheelchair, which he reportedly borrowed from a family member, and the TS opinion that the claimant required a cane to ambulate. Detailed exams in the MER show normal gait and station, normal neurological exam including DTR, sensation, coordination, and no focal neurological findings. Further the claimant did not allege worsening of the conditions on appeal on the form 3441. Clearly the claimant was not making full effort at the IMCE.

(*Id.*)

D.    **Hearing Testimony**

During the May 12, 2022 hearing, Jarvis testified to the following:

- He lives in an apartment with his wife.  (*Id.* at 48.)  He has a driver's license and drives short distances.  (*Id.*)  He has no medical restrictions on his license.  (*Id.* at 48-49.)

- He completed tenth grade.  (*Id.*)  He was in special education classes in school for learning disabilities.  (*Id.*)

- He has not been able to work because he had two neck surgeries and had steel plates and pins put in his neck.  (*Id.* at 52.)  He has restless leg syndrome, and it has gotten worse.  (*Id.*)  His legs feel numb and tingly all the time.  (*Id.*)  He has had restless leg syndrome for at least ten years.  (*Id.*)  He takes medication, which somewhat helps,

but it does not take the tingling sensation away.  (*Id.*)  He also has weakness and arthritis in his right arm and hand.  (*Id.* at 53.)  He has constant pain in his neck and into his back.  (*Id.* at 57.)  All he can do is take Tylenol.  (*Id.*)  He tried injections and therapy, and they just made the pain worse.  (*Id.*)

- He can lift ten pounds at most with both hands.  (*Id.* at 53.)  He sometimes has problems picking up things with his right hand.  (*Id.*)  He can pick up a coffee cup with his right hand.  (*Id.*)  He can walk thirty yards or so before needing to rest.  (*Id.* at 53-54.)  He uses a cane to walk.  (*Id.*)  He also has a wheelchair.  (*Id.*)  He has had the cane for seven or eight years.  (*Id.* at 54-55.)  His doctor prescribed the cane because of his legs; he had trouble standing too long and his legs started getting "flimsy" from his restless leg syndrome.  (*Id.* at 55.)  His doctor prescribed a wheelchair five months ago.  (*Id.*)  He takes it with him if he is going to the store. (*Id.*)  He needs a wheelchair because his legs are getting worse.  (*Id.*)  He can do some walking, but not a lot of walking.  (*Id.* at 56.)  He needs a wheelchair for longer distances.  (*Id.*)  His most comfortable position is in a recliner with his legs propped up.  (*Id.* at 58.)  He can reach overhead, but it would cause him pain in his hands and arms.  (*Id.* at 61.)  He can stand for maybe half an hour before he would need to sit. (*Id.* at 63.)  He can sit for an hour before he would need to get back up.  (*Id.*)

- On a typical day, he gets up and has coffee and breakfast.  (*Id.* at 58.)  He may need to go to the doctor, but most of the time he stays at home.  (*Id.*)  He goes grocery shopping every once and a while.  (*Id.*)  His wife does the household chores.  (*Id.*) He can bathe and dress himself.  (*Id.* at 59.)  He watches TV and takes a nap during the day.  (*Id.*)  He does not use the computer.  (*Id.*)  They have a pug, but he does not walk the dog.  (*Id.*)  His wife takes the dog out.  (*Id.* at 60.)

- He has fallen many times because his legs gave out.  (*Id.* at 61.)  He last fell a month ago.  (*Id.*)  He thinks he fell 20-30 times in the past year because his legs gave out. (*Id.*)

The VE testified Jarvis had past work as a construction worker and scrap burner.  (*Id.* at 65.)  The ALJ then posed the following hypothetical question:

> Assume a hypothetical individual of the Claimant's age and education with the past jobs that you described.  Further assume this individual can perform light work and can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds.  Can frequently balance and stoop and occasionally kneel, crouch, and crawl.  He can perform simple, routine tasks in an environment free of fast-paced production requirements or strict production quotas and which is relatively static with infrequent changes and where changes can be explained/demonstrated.  He can have occasional, superficial interaction with others.  Superficial meaning that he should perform no work tasks that involve customer service duties, confrontation, conflict resolution, collaboration,

16

directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others.  Could the hypothetical individual perform either of the jobs you described as actually or generally performed in the national economy?

(*Id.* at 66.)

The VE testified the hypothetical individual would not be able to perform Jarvis' past work as a construction worker and scrap burner.  (*Id.* at 67.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as merchandise marker, checker I, and office helper.  (*Id.*)

The ALJ modified the hypothetical by changing the exertional level to sedentary.  (*Id.*)  The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as telephone quotation clerk, surveillance system monitor, and escort vehicle driver.  (*Id.* at 68.)

The ALJ modified the first and second hypotheticals to limit the hypothetical individual to frequent handling and fingering with the right upper extremity.  (*Id.* at 68-69.)  The VE testified the previously identified jobs would remain.  (*Id.* at 69.)

The ALJ modified the hypotheticals to add the need for a cane for ambulation.  (*Id.*)  The VE testified the light jobs would be precluded.  (*Id.*)  If the person just needed the cane to and from the workstation, the sedentary jobs would remain.  (*Id.* at 70.)

The ALJ modified the hypotheticals to add the need for a wheelchair.  (*Id.*)  The VE testified the need for a wheelchair would preclude all sedentary unskilled jobs.  (*Id.*)

In response to questioning from Jarvis' counsel, the VE testified that a limitation to occasional handling and fingering would preclude all employment.  (*Id.* at 73.)  A limitation to occasional handling and fingering of the right upper extremity, which is the dominant hand, would leave one job, an usher, with 5,133 such jobs in the national economy.  (*Id.* at 74.)

17

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart

P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Jarvis was insured on his alleged disability onset date, October 31, 2015, and remained insured through December 31, 2019, his date last insured ("DLI").  (Tr. 17-18.) Therefore, in order to be entitled to POD and DIB, Jarvis must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.    The claimant has not engaged in substantial gainful activity since October 31, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease of the cervical spine status post laminectomy surgery, stenosis of the cervical spine, degenerative disc disease of the thoracic spine, obesity, restless leg syndrome, osteoarthritis of the right hand, history of right shoulder sprain, and unspecified neurodevelopmental disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

19

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. He can frequently balance and stoop and occasionally kneel, crouch, and crawl. He should avoid concentrated exposure to dangerous moving machinery and unprotected heights. He can frequently handle and finger with the right upper extremity. He can perform simple routine tasks in an environment free of fast-paced production requirements or strict production quotas and which is relatively static with infrequent changes and where changes can be explained and/or demonstrated. He can have occasional superficial interaction with others, superficial meaning that he should perform no work tasks that involve customer service duties, confrontation, conflict resolution, collaboration, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on June **, 1970 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-30.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social

Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for

21

reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Need for Assistive Device

In his first assignment of error, Jarvis argues that the ALJ erred in evaluating his need for a cane or wheelchair.  (Doc. No. 11 at 17.)  Jarvis asserts that the record contains several references to him using a cane, as well as a wheelchair prescription, and Dr. Yu Han Lee opined twice that both a cane and a wheelchair had been prescribed.  (*Id.*)  Jarvis maintains that, in addition to the prescription, "the record amply demonstrates that [he] needs an assistive device, whether a cane or a wheelchair."  (*Id.*)  Jarvis argues that the ALJ's conclusions regarding his need for a wheelchair "results from a simple misreading of the evidence."  (*Id.* at 18.)

22

The Commissioner responds that substantial evidence supports the ALJ's finding that the use of a cane or wheelchair was not a medical necessity.  (Doc. No. 12 at 11.)  The Commissioner argues that there was a conflict in the medical evidence as to whether an assistive device was needed, and it was unclear who prescribed Jarvis a cane.  (*Id.* at 11-12.)  The ALJ resolved the conflict by determining the evidence did not show the use of an assistive device was medically necessary.  (*Id.* at 12.)  In addition, the state agency reviewing physicians had considered the October 2021 evaluation where Jarvis used a wheelchair, was well as Dr. Lee's opinions, and did not include a limitation for an assistive device in the RFC.  (*Id.* at 13.)  Jarvis fails to challenge the weight assigned to the opinions of the state agency physicians or Dr. Lee. (*Id.*)  Furthermore, while Jarvis was prescribed a cane and a wheelchair, the record did not reflect the circumstances for which an assistive device was needed, which is necessary for a finding of medical necessity.  (*Id.* at 13-14) (citing SSR 96-6p).  To the extent the ALJ made a confusing statement about the wheelchair prescription, "the decision as a whole reflects adequate consideration of the prescription and identifies substantial evidence in support of the ALJ's finding."  (*Id.* at 14-15.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that

23

evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that

24

an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

SSR 96-9p states, in relevant part:

> *To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).* The adjudicator must always consider the particular facts of a case.  For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996) (emphasis added).

Interpreting this ruling, the Sixth Circuit has explained that where a cane "was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002).  The Sixth Circuit has not directly ruled on this issue but other courts in this district have noted that, in cases involving assistive devices including a cane, documentation "describing the circumstances for which [the assistive device] is needed" is critical to establishing that it qualifies as a "necessary device" under SSR 96-9p.  *McGill v. Comm'r of Soc. Sec. Admin.*, No. 5:18 CV 1636, 2019 WL 4346275, at *10 (N.D. Ohio Sept. 12, 2019), citing *Carreon v. Massanari*, 51 F. App'x at 575;  *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to

show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

Furthermore, as this Court has recently determined:

> [M]edical evidence that is simply consistent with the use of a cane is also insufficient. The fact remains that "[p]laintiff has not pointed to 'any medical documentation establishing that a cane is medically necessary or describing the circumstances for which it is needed, as SSR 96-[9p] requires.'" *Rodgers-Eaches v. Comm'r of Soc. Sec.*, No. 1:20-cv-69, 2021 WL 164254, at *7 (S.D. Ohio Jan. 19, 2021) (rejecting similar evidence of back impairment and ankle pain as insufficient to establish medical need for a cane) (quoting *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356, at *6 (S.D. Ohio Mar. 13, 2019), *report and recommendation adopted,* 2019 WL 3955407 (S.D. Ohio Aug. 22, 2019)). Absent medical documentation demonstrating need and the circumstances for which the cane was needed, the ALJ was not required to include the cane in his RFC analysis.

*Stupka v. Saul*, No. 1:19-CV-2305, 2021 WL 508298, at *4 (N.D. Ohio Feb. 11, 2021).

Where use of a wheelchair is "intermittent" or "variable," including when a Plaintiff describes the use of a wheelchair as limited to "long distances," courts in this district have held that an ALJ did not err in omitting this limitation. *See, e.g., Coakwell v. Comm'r of Soc. Sec.*, No. 1:19 CV 2876, 2020 WL 7711125, at *7 (N.D. Ohio Dec. 29, 2020).[3]

At Step Three, the ALJ found that while Jarvis "was noted to use a wheelchair on two occasions, the evidence did not indicate who prescribed an ambulatory aid and the balance of the treatment notes showed generally normal gait and station. Accordingly, the evidence did not establish that he required an ambulatory aid." (Tr. 21.)

In the RFC analysis, the ALJ found as follows:

> In terms of the claimant's physical conditions, he had only intermittent treatment and complaints for several years during the early portion of the relevant period. Over time, he developed restless leg syndrome, which eventually was controlled largely with medication. Furthermore, the claimant

---

[3] In *Coakwell*, as in this case, there was also conflicting evidence regarding the need for a wheelchair.

26

had a history of spinal conditions and surgery, but the treatment notes did not show consistent symptoms or complaints. A recent noted from Dr. Lee indicated that the claimant used a cane and he had been approved for a wheelchair. In a consultative exam, he was also using a wheelchair. However, the balance of his treatment notes showed normal gait and station and there was no mention of use of an ambulatory aid. Additionally, while the claimant had impaired strength and sensation at times, such symptoms were only intermittent during the relevant period. The balance of the evidence established that he could perform the reduced range of light work described in the residual functional capacity.

(Tr. 28.)

In weighing the medical opinions of record, the ALJ further found as follows:

Yu Han Lee, M.D. stated that the claimant could lift and carry ten pounds and stand and walk for thirty minutes at a time (B16F/1). Dr. Lee asserted that the claimant could rarely perform all postural activities and frequently push, pull, and perform fine and gross manipulation (B16F/1, 2). According to Dr. Lee, the claimant had been prescribed a cane and wheelchair and he had to elevate his legs forty-five degrees (B16F/2). Dr. Lee concluded that the claimant required additional unscheduled rest periods per day (B16F/2). He later offered a similar opinion (B20F). Dr. Lee also said that the claimant had extreme mental limitations, including describing work activity, asking and answering questions, cooperating with others, asking for help when needed, handling conflicts with others, completing tasks in a timely manner, changing activities without disruption, working closely with others, adapting to changes, setting realistic goals, and responding to demands (B21F/2). The undersigned finds Dr. Lee's opinions unpersuasive. The record failed to document the extreme degree of restriction he described. Indeed, the claimant did not have ongoing mental health complaints, let alone the debilitating symptoms Dr. Lee described. Likewise, the claimant had relatively modest physical exam findings with generally normal gait and no indication of the need for an ambulatory aid. It is unclear what physical and mental findings Dr. Lee relied upon in determining the near complete inability to function in a work environment that he described.

The claimant had a medical consultative exam with Craig Hermann, D.O. where the claimant reported a history of neck and back injuries with numbness and tingling in his extremities (B19F/1). He said he ambulated with a cane and his primary care physician ordered a wheelchair (B19F/1). He was using a borrowed wheelchair during the exam (B19F/1). The claimant had mild aphasia, sensory deficits in his hands, and complete absence of sensation in his lower legs with some extremity weakness (B19F/3). He had significant difficulty standing and he was unsteady when trying to walk (B19F/3). The claimant demonstrated tenderness to palpation in his neck with mild swelling of the bilateral metacarpophalangeal joints (B19F/3). Dr. Herman noted that the

27

claimant had significant disability with standing and walking and an inability to perform fine tasks (B19F/3). The undersigned finds Dr. Herman's opinion unpersuasive. While he examined the claimant, the treatment notes and other exams of the record did not show the significant dysfunction that was displayed in Dr. Herman's exam. Indeed, treatment exams documented largely normal strength, gait, and station and little mention of an inability to perform fine manipulation.

State Agency medical consultants adopted the physical portion of the residual functional capacity from the previous decision (B4A; B8A). The undersigned finds such assessments persuasive in part because the record confirmed that the claimant could perform light work generally with the non-exertional limitations described. However, evidence of the claimant's right-hand osteoarthritis necessitated limitations handling, fingering, and being around hazards.

(*Id.* at 26-27.)  As the Commissioner points out, the state agency reviewing physicians had the benefit of reviewing Dr. Hermann's opinion and Dr. Lee's August 2021 opinion.   (*Id.* at 120, 124.)   On reconsideration, Dr. Hinzman opined:

There is no severe MDI that explains the inability to stand and walk or the need for any ambulatory aids including his present presentation in a wheelchair, which he reportedly borrowed from a family member, and the TS opinion that the claimant required a cane to ambulate. Detailed exams in the MER show normal gait and station, normal neurological exam including DTR, sensation, coordination, and no focal neurological findings. Further the claimant did not allege worsening of the conditions on appeal on the form 3441. Clearly the claimant was not making full effort at the IMCE.

(*Id.* at 124.)  Jarvis fails to challenge the weight assigned to these medical opinions on judicial review.

Substantial evidence supports the ALJ's determination that an assistive device was not a medical necessity.   While a doctor had prescribed Jarvis a cane and Dr. Yu Han Lee prescribed Jarvis a wheelchair, none of the records cited by Jarvis state that an assistive device is medically necessary, let alone set forth the circumstances in which it is necessary, as SSR 96-9p requires.  "The lack of showing required under SSR 96-9p is all the more pronounced given that the record is inconsistent, at best, as to [Jarvis'] use of and need for [an assistive device]."  *Stupka*, 2021 WL 508298, at *4.  As the ALJ noted, the evidence was mixed regarding Jarvis' use of a cane and wheelchair.  Jarvis himself testified that he

28

only used a wheelchair for longer distances.  (Tr. 56.)  Jarvis' "use of a wheelchair was periodic at best and there is nothing in the record to show any provider instructed [him] on how or when the device was needed." *Coakwell*, 2020 WL 7711125, at *7.  As set forth above, where use of a wheelchair is "intermittent" or "variable," including where use of a wheelchair is limited to "long distances," courts in this district have held that an ALJ did not err in omitting this limitation.  *See, e.g., id.*

Furthermore, while the ALJ's statement that "while the claimant was noted to use a wheelchair on two occasions, the evidence did not indicate who prescribed an ambulatory aid" (Tr. 21) was incorrect as to the wheelchair prescribed by Dr. Yu Han Lee, it was accurate as it related to Jarvis' cane prescription. Nor does that misstatement affect the other grounds for the ALJ's determination, namely that "the balance of the treatment notes showed generally normal gait and station" and "the evidence did not establish that he required an ambulatory aid."  (*Id.* at 28.)  A perfect opinion is not required.  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

In sum, while there may be evidence supporting Jarvis' use of an assistive device, substantial evidence also supports the ALJ's RFC determination and its compliance with SSR 96-9p.  An ALJ decision cannot be reversed merely because there exists some other evidence in the record that might support a different conclusion.  *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion ... This is so because there is a 'zone of choice' within which the Commissioner can act without the fear of court interference.") (citation omitted).

**B.**     **Neurocognitive Disorder and Intellectual Ability Deficit**

In his second assignment of error, Jarvis argues that the ALJ erred at Step Three by considering only Listing 12.11, which governs neurodevelopmental disorders, instead of also considering Listing 12.02, which governs neurocognitive disorders, and Listing 12.05, which governs intellectual disorders. (Doc. No. 11 at 19-20.)  Jarvis asserts the ALJ further erred by failing to include limitations addressing his intellectual ability, including those opined by Dr. Meyer, and that this error stemmed from the ALJ's failure to recognize "the appropriate impairment."  (*Id.* at 21.)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of and findings regarding Jarvis' mental functioning.  (Doc. No. 12 at 15.)  The Commissioner argues that the ALJ stated she considered all relevant listings, with an emphasis on Listing 12.11.  (*Id.*)  In evaluating the paragraph B criteria of Listing 12.11 – which is the same under Listing 12.02 – the ALJ found Jarvis had moderate limitations in all four areas, a finding Jarvis fails to challenge on judicial review.  (*Id.* at 15-16.) In addition, the ALJ further found Jarvis failed to meet the paragraph C criteria – which is not an element of Listing 12.11 but is an element of Listings 12.02, 12.03, 12.04, 12.05, and 12.06 – a finding Jarvis also fails to challenge on judicial review.  (*Id.* at 16.) The ALJ's RFC "substantially match[ed]" that of the state agency reviewing psychologists, who had the benefit of reviewing Jarvis' school records and the opinions of Drs. Lyall, Meyer, and Krabbe, and Jarvis does not challenge the weight the ALJ assigned to the opinions of the state agency reviewing psychologists.  (*Id.* at 16-17.)  The Commissioner maintains that Jarvis' argument is further unavailing because "(1) the disability adjudication process is a function-based analysis rather [than a] diagnosis-driven one and (2) there is no substantial question as to whether either Listing 12.02 or Listing 12.05 was met or medically equaled."  (*Id.* at 17.)  Finally, the Commissioner argues that the ALJ's RFC includes the same mental limitations as the prior ALJ decision, which found Jarvis' intellectual disability to be a severe impairment.  (*Id.* at 20.)

30

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 40.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to

31

conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his or her decision. *Id.* at 416-17.

Listing 12.00, the introductory paragraph to the mental disorder Listings of 20 C.F.R. Pt. 404, Subpt. P, App. 1, states in relevant part:

> 2. Listings 12.07, 12.08, 12.10, **12.11**, and 12.13 have two paragraphs, designated A and B; your mental disorder must satisfy the requirements of both paragraphs A and B. Listings **12.02**, 12.03, 12.04, 12.06, and 12.15 have three paragraphs, designated A, B, and C; your mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. Listing **12.05** has two paragraphs that are unique to that listing (see 12.00A3); your mental disorder must satisfy the requirements of either paragraph A or paragraph B.
>
> a. Paragraph A of each listing (except **12.05**) includes the medical criteria that must be present in your medical evidence.
>
> b. Paragraph B of each listing (except **12.05**) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see §§ 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except **12.05**.)

Listing 12.00 of 20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added). Thus, in order for Jarvis to meet Listing 12.02, he must meet the criteria of both paragraph A and paragraph B of that Listing of paragraph A and paragraph C of that Listing.

32

To satisfy the requirements of Listing 12.05, Jarvis must meet the criteria of either 12.05(A) or 12.05(B), which are as follows:

A. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

OR

B. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evidenced by a or b:

a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 12.00E1); or

b. Interact with others (see 12.00E2); or

c. Concentrate, persist, or maintain pace (see 12.00E3); or

d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

> At Step Three, the ALJ found as follows:

>> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching such conclusion, the undersigned considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(f), 416.927(f)). *The undersigned considered all relevant listings in reaching this finding*, with specific emphasis on listings 1.15, 1.16, 1.18, and 12.11.

(Tr. 21) (emphasis added).

The Court finds substantial evidence supports the ALJ's Step Three findings. First, Jarvis' argument is not well-taken, as counsel for Jarvis told the ALJ Jarvis "should be found disabled based on the grids." (*Id.* at 46.) In addition, while the ALJ did not specifically identify Listings 12.02 and 12.05, the ALJ stated she considered all relevant listings in reaching her finding that Jarvis' impairments did not meet or medically equal a listing. (*Id.*) With respect to Listing 12.05(A), Jarvis fails to identify evidence that he is unable to participate in standardized testing of intellectual functioning or that he depends upon others for his personal needs. With respect to Listing 12.02, the ALJ found Jarvis had only moderate limitations in all four areas of the paragraph B criteria of Listing 12.11 – which is the same for Listing 12.02 and is a necessary component of satisfying 12.05(B) – and did not meet the paragraph C criteria (*id.* at 21-22), findings Jarvis does not challenge on judicial review. Nor does Jarvis challenge the weight assigned to the state agency reviewing psychologists' opinions, who also found Jarvis did not meet or equal any of the listed impairments.

However, even assuming the ALJ's Step Three analysis was insufficient, the Sixth Circuit has found that remand is not required where the error is harmless. *See, e.g., Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364-366 (6th Cir. 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th

Cir. July 15, 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). *See also Ison*, 2017 WL 4124586, at **5-6; *Cygan v. Comm'r of Soc. Sec.*, Case No. 14-14356, 2016 WL 1128087, at **2-3 (E.D. Mich. March 23, 2016); *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at **5-7 (N.D. Ohio June 18, 2015); *Wilson v. Colvin*, No. 3:13-CV-710-TAV-HBG, 2015 WL 1396736, at **3-4 (E.D. Tenn. March 26, 2015).  Specifically, a court may find an ALJ's failure to adequately discuss whether a claimant meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Forrest*, 591 F. App'x at 366.  *See Bledsoe,* 165 F. App'x at 411 (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge*, 572 F. App'x at 417 (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion). *See also Ison*, 2017 WL 4124586, at *5 (stating "this Court may review the entire administrative decision to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion"); *Kerns v. Comm'r of Soc. Sec.*, Case No. 2:16-cv-57, 2017 WL 1324609, at **2-3 (S.D. Ohio April 11, 2017) (finding the ALJ supported its step three determination in her review of the medical evidence, extensive analysis conducted during the RFC assessment, and credibility determination).

In the RFC analysis, the ALJ discussed Jarvis' mental impairments and noted evidence that undercut a finding of disability.  (Tr. 26-28.)  In addition, the ALJ found as follows:

> In a February 2018 consultative exam with Natalie Meyer, Psy.D., the claimant walked slowly with a cane (B3F/3). He was cooperative and polite with adequate grooming and hygiene (B3F/3). He had limited understanding of questions and directions requiring clarification (B3F/3). The claimant stammered and mumbled, making him hard to understand (B3F/3). He demonstrated a wide range of affect and appropriate mood with borderline intelligence (B3F/4). He had adequate judgment and limited insight (B3F/4).

35

Dr. Meyer stated that the claimant might require simplification and repetition to understand and carry out instructions, he might be confused during multi-step tasks, he might be unaware of social norms and relationships in the workplace, and he would require support to adjust to new tasks or changes (B3F/6). The undersigned finds Dr. Meyer's opinion persuasive in part because the claimant's mental condition limited him to simple tasks in a relatively static and socially limited environment. However, Dr. Meyer did not define would constituted "support" when adjusting to new tasks.

The claimant had a psychological consultative exam in March 2021 with Bryan Krabbe, Psy.D., where the claimant reported difficulty with memory, focus, and completing tasks in a timely fashion (B14F/1, 3). He had slowed conversation due to frequent stuttering but normal language, euthymic mood, and adequate grooming and hygiene (B14F/4). He demonstrated difficulty with calculating division and fractions, but adequate attention and concentration (B14F/4). He had below average intelligence, short-term memory, and abstract reasoning (B14F/4, 5).

Dr. Krabbe stated that the claimant might have difficulty acquiring new information, following instructions, and maintaining attention, but no substantial social limitations (B14F/6). The undersigned finds Dr. Krabbe's opinion persuasive in part because it was based on the exam findings generally, but Dr. Krabbe did not describe specific functional limitations.

* * *

State Agency psychological consultants asserted that the claimant had moderate limitations in the paragraph B criteria (B4A; B8A). The consultants said that the claimant could understand, remember, concentrate, and persist on simple work instructions to perform simple unskilled tasks in a static environment (B4A; B8A). The consultants said that the claimant could interact occasionally and superficially in situations not requiring persuasion or frequent contact with the public (B4A; BA). According to the consultants, the claimant was capable of carrying out tasks where duties are relatively static and changes can be explained (B4A; B8A). The undersigned finds such assessment persuasive. The record confirmed that the claimant could perform simple tasks in a static and socially restricted environment generally. However, the claimant's largely normal behavior did not support the need for limited contact with the public.

With respect to the claimant's alleged symptoms and limitations, the undersigned finds such assertions only partially consistent with the evidence. The claimant did not have any ongoing mental health complaints or treatment. While he had some attention and memory impairment at a consultative exam, he had generally normal thoughts, cooperative behavior, and adequate insight and

judgment. Accordingly, he could perform simple tasks in the static and socially limited environment of the residual functional capacity.

(*Id.* at 26-28.)   As mentioned above, Jarvis fails to challenge the ALJ's findings regarding the weight assigned to the opinions of Dr. Meyer or the state agency reviewing physicians.  (Doc. No. 11.)

Therefore, any error at Step Three was harmless.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: March 1, 2024                                   *s/ Jonathan Greenberg*
                                                                Jonathan D. Greenberg
                                                                United States Magistrate Judge